UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 10-cv-119 (JFB) (ARL)

KEITH POOLER,

Plaintiff,

VERSUS

NASSAU UNIVERSITY MEDICAL CENTER, ET AL.,

Defendants.

**MEMORANDUM AND ORDER**
March 23, 2012

JOSEPH F. BIANCO, District Judge:

Plaintiff Keith Pooler ("Pooler" or "plaintiff") brought this action against the Nassau Health Care Corporation, sued herein as Nassau University Medical Center ("NHCC"), Dr. Bruce David ("David") and Joseph Farhangian ("Farhangian") (collectively, "defendants") alleging violations of Pooler's constitutional rights pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants showed deliberate indifference to the plaintiff's serious medical need when they denied the plaintiff medication for "anxiety and sleeping disorder" and the plaintiff subsequently suffered a "massive anxiety attack" that triggered a suicide attempt. Specifically, on December 23, 2009, plaintiff jumped from the second tier of E2A dorm, landing feet first. Plaintiff also alleges various state law claims, including negligence.

The defendants now move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that: (1) plaintiff failed to exhaust his remedies under the Prison Litigation Reform Act of 1995 ("PLRA"), and (2) no rational jury could find that defendants acted with deliberate indifference to a serious medical need. For the reasons set forth below, the Court agrees with defendants and grants defendants' motion for summary judgment on the federal claims in its entirety. In particular, with respect to the failure to exhaust, the uncontroverted evidence in the record establishes that (1) there is a well-established Grievance Procedure in the Inmate Handbook, which plaintiff confirmed he received, requiring a grievance to be filed within five days of the occurrence; (2) plaintiff was familiar with the grievance procedure because he had filed at least two prior grievances regarding his medical care (unrelated to the issues in this lawsuit); (3)

plaintiff did not file a grievance with respect to the alleged lack of medical care that is the subject of this lawsuit; and (4) no special circumstances prevented plaintiff from filing such a grievance, nor is there any other exception to the exhaustion requirement that applies here.  Thus, summary judgment is warranted in defendants' favor based upon plaintiff's failure to exhaust his remedies under the PLRA regarding the medical care at issue in this lawsuit.

In any event, even assuming *arguendo* that plaintiff had properly exhausted his claims, summary judgment would still be warranted on the medical indifference claims because, based upon the uncontroverted evidence, no rational factfinder could conclude that the defendants were deliberately indifferent to a serious medical need.  First, with respect to defendant David, it is uncontroverted that (1) David saw plaintiff only once (over six months prior to the December 23rd incident); (2) plaintiff's counselor at the drug treatment program reported that plaintiff was "extremely manipulative"; (3) plaintiff reported no history of psychiatric hospitalization, and did not claim to have current thoughts of suicide (although he had in the past); and (4) David offered plaintiff mental health services and counseling to help with coping skills (which plaintiff received).  Given these uncontroverted facts, no rational jury could find David to have been deliberately indifferent to a serious medical condition or to a threat to plaintiff's health and safety.  Second, with respect to defendant Farhangian, there are no specific allegations against him in the complaint.  In any event, to the extent that plaintiff is claiming that Farhangian should have provided him with medication, it is uncontroverted that (1) Farhangian, as a social worker, cannot prescribe medication; (2) during the December 3, 2009 interview, plaintiff denied making any statement that he had threatened to kill himself, and Farhangian scheduled him for further counseling the next day; (3) Farhangian saw plaintiff again on December 18, 2009 and found him to be cooperative and future oriented; (4) Farahangian was aware of a history of plaintiff making suicide threats to get what he wanted; (5) on December 23, 2009 although plaintiff stated he was "going to kill himself," he did not have a plan, and Farhangian did not believe plaintiff was suicidal, but rather was concerned about his housing situation; and (6) Farhangian offered to place plaintiff in protective custody, and reported his housing issues to Corrections.  As with defendant David, no rational jury could conclude, given these uncontroverted facts, that Farhangian was deliberately indifferent to a serious medical condition.  Finally, the *Monell* claim against the NHCC cannot survive summary judgment because there is no underlying Eighth Amendment violation against the individual defendants and, in any event, because there is no evidence of a policy, practice, or custom at the NHCC that deprived plaintiff of his constitutional rights.  Given that the federal claims cannot survive summary judgment, the Court declines to exercise supplemental jurisdiction over the state law claims and, thus, dismisses them without prejudice.

I. BACKGROUND

A.  Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 Statements of Facts.  Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005).  Unless otherwise noted, where a party's 56.1

Statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[1] Specifically, the Court notes that plaintiff often disputes a factual statement, but provides no explanation for why he is disputing it (because he lacks personal knowledge of the fact) and does not cite to any evidence in the record to contradict the fact.

Plaintiff entered Nassau County Correctional Center ("NCCC") on June 13, 2009, and remained there until April 18, 2011, when he was transferred to State custody. (Defs.' 56.1 ¶ 1.) Upon admission to NCCC, the plaintiff was examined at Medical Intake. He reported a history of hypertension, borderline diabetes mellitus, anxiety and depression, with a prior suicide attempt in 2006. (*Id.* at ¶ 2.) Plaintiff had recently been released from State custody, and was attending a drug treatment program referred to as "EDNY," as part of his parole. (*Id.* at ¶ 3.) He reported that his counselor at EDNY was named Angela, but could not recall the name of his medication. (*Id.*)

Defendants state that plaintiff threatened suicide while in state custody prior to entering NCCC. (*Id.*) Plaintiff confirmed this at his deposition, explaining that he had attempted suicide by hanging himself "from the bunk" while he was in state custody in 2007. (Plaintiff's Deposition, Defs.' Mot. for Summary Judgment, Ex. H ("Pl.'s Dep.") at 24.) In his 56.1 statement, however, plaintiff denies threatening suicide while in state custody. (Pl.'s 56.1 ¶ 3.)

While in state custody, plaintiff received counseling, but was not medicated. (Defs.' 56.1 ¶ 3.)

On June 13, 2009, plaintiff was interviewed by Felice Barasch, a psychiatric social worker. (Defs.' 56.1 at ¶ 5.) During this interview, plaintiff reported his treatment at EDNY for anxiety and sleep problems, and related that in the past he had had thoughts of suicide and had made suicidal gestures. (*Id.*) Plaintiff confirmed a history of substance of abuse. (*Id.*)

On June 15, 2009, David interviewed plaintiff as part of plaintiff's mental health evaluation. (*Id.* at ¶ 6.) In performing this assessment, David contacted Angela Rainey, plaintiff's counselor at EDNY, and reviewed Barasch's intake notes. (*Id.*) Rainey advised David that the plaintiff was receiving Seroquel at bedtime, and Celexa for anxiety. (*Id.* at ¶ 7.)[2] During the interview with David, plaintiff related that he had a serious history of drug abuse, including cannabis and crack cocaine. (*Id.*) Plaintiff reported no history of psychiatric hospitalization. (*Id.*)

Following the interview, David found that plaintiff was neither depressed nor suicidal, and concluded that he was not in need of medication.[3] (*Id.* at ¶ 8.) Instead, David offered the plaintiff mental health services and counseling to help with his

---

[1] In addition, although the parties' Rule 56.1 Statements contain specific citations to the record to support their statements, the Court has cited to the Rule 56.1 Statements, rather than the underlying citation to the record, when utilizing the 56.1 Statements for purposes of this summary of facts.

[2] In his affidavit, David states that Rainey reported that plaintiff was "extremely manipulative." (Affidavit of Bruce David, Defs.' Mot. for Summary Judgment, Ex. E ("David Aff.").) Although plaintiff disputes that Rainey told David that he was manipulative (Pl's. 56.1 ¶ 7), plaintiff does not claim to have been present for the conversation and provides no factual basis for disputing it.

[3] Plaintiff contends that David declined to prescribe plaintiff medication "to save Nassau money" (Pl.'s 56.1 ¶ 8), but provides no factual basis for that statement.

3

coping skills. (*Id.*) David had no further interactions with plaintiff. (*Id.*) Plaintiff's mental health chart reveals that plaintiff was subsequently seen for regularly scheduled counseling visits through September 2009, and thereafter on request. (*Id.*)

Although plaintiff was seen primarily by Laura Luzi, a licensed clinical social worker in the department, plaintiff was also interviewed on a number of occasions by Joseph Farhangian, another licensed clinical social worker who was responsible for supervising the staff of social workers in NCCC. (*Id.* at ¶ 9.) On December 3, 2009, Farhangian saw plaintiff at the request of staff at NCCC ("Corrections") after it was reported that plaintiff was considering killing himself. (*Id.* at ¶ 10.) At the interview, plaintiff denied that he was suicidal, relating that he "just wanted to see someone." (*Id.*) Farhangian next saw plaintiff on December 18, 2009 for a scheduled appointment. (*Id.* at ¶ 11.)[4]

On December 23, 2009, Farhangian again interviewed the plaintiff. (*Id.* at ¶ 12.) Defendants state that Corrections requested that Farhangian interview the plaintiff because the plaintiff had said he was "going to kill himself." (*Id.*) Plaintiff, however, states that he never said he was "going to kill himself," and in fact said he was "harmful to himself and other[s]." (Pl.'s 56.1 ¶ 12.) During the interview with Farhangian, plaintiff described his anxiety problems and said he did not "feel strong enough to make it in the dorm" and needed to be "isolated" so that he did not harm anyone. (Pl.'s Dep. at 68.) Plaintiff told Farhangian that he was "harmful to myself and others." (*Id.* at 69.) Farhangian offered to put plaintiff in protective custody and reported plaintiff's housing concerns to Corrections. (*Id.*; Defs.' 56.1 ¶ 12.)

On December 23, 2009, in an apparent suicidal gesture, plaintiff jumped from the second floor tier of E2A dorm, landing feet first. (Defs.' 56.1 ¶ 13.)[5] Medical was immediately notified, and plaintiff was transported to Nassau University Medical Center ("NUMC"). (*Id.*) After this suicidal gesture, plaintiff continued to be seen on a regular basis by mental health staff. (*Id.* at ¶ 14.)

B. Procedural Background

*Pro se* plaintiff filed the complaint in this action on January 11, 2010. Defendants answered the complaint on April 16, 2010. Plaintiff moved to amend his "pleadings" and narrative statement on October 13, 2010. On December 3, 2010, the Court granted the plaintiff's motion to amend his narrative statement, and deemed that the information contained in plaintiff's October 13, 2010 filing would supplement his prior narrative statement. On June 6, 2011, defendants moved for summary judgment, which included the requisite Notice to *Pro Se* Litigants pursuant to Local Rule 56.2. Plaintiff submitted his opposition on July 19, 2011. Defendants submitted their reply on July 29, 2011. Plaintiff submitted a sur-reply on August 15, 2011. The Court has fully considered the submissions of the parties.

---

[4] Defendants state that plaintiff was requesting a change in housing because of conflicts, but plaintiff disputes that he was having any conflicts. (Defs.' 56.1 ¶ 11, Pl.'s 56.1 ¶ 11.) This dispute, along with the other alleged factual disputes, is not dispositive for purposes of this motion.

[5] Defendants state that plaintiff "landed feet first on soft chairs before falling to the ground." (Defs.' 56.1 ¶ 13.) Plaintiff states that he "land[ed] feet first to floor injuring his right leg and lower back." (Pl.'s Mem. of Law at 7.)

4

II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S. Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

III. DISCUSSION

A. Failure to Exhaust

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim because plaintiff has not exhausted his administrative remedies. For the reasons set forth below, the Court agrees.

1.  Legal Standard

The Prison Litigation Reform Act of 1995 states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." *Espinal v. Goord*, 554 F.3d 216, 222 (2d Cir. 2009) (quoting *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002) (citations omitted)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal*, 554 F.3d at 223 (citing *Jones v. Bock*, 549 U.S. 199, 218, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007) and *Woodford*, 548 U.S. at 88-90).

Prior to *Woodford*, 548 U.S. 81, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006), the Second Circuit:

> recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance.

*Reynoso v. Swezey*, 238 F. App'x 660, 662 (2d Cir. 2007) (internal citations omitted); *see also Davis v. New York*, 311 F. App'x 397, 399 (2d Cir. 2009) (citing *Hemphill v. New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004)). Initially, it was unclear whether the above-discussed considerations would be impacted by *Woodford*. *See, e.g.*, *Reynoso*, 238 F. App'x at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether *Woodford* has bearing on them."); *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("We need not determine what effect *Woodford* has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre-*Woodford* case law."). However, the Second Circuit has continued to hold post-*Woodford* that an inmate's failure to comply with the exhaustion requirement may be excused on these grounds. *See Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011) (citing the *Hemphill* factors).[6]

---

[6] In any event, this Court need not decide whether *Woodford* narrowed the three

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216; *see also Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)). Moreover, the Second Circuit has made clear that an inmate is not entitled to a jury trial on factual disputes regarding this failure to exhaust administrative remedies under the PLRA.[7] *See Messa*, 652 F.3d at 310.

2. Application

Defendants argue that plaintiff failed to exhaust his remedies under the PLRA because he did not file a grievance with respect to his mental health care. Defendants attach as an exhibit the "Nassau County Sheriff's Department Inmate Handbook." (Defs.' Mot. for Summary Judgment, Ex. J.) The handbook explains that "Nassau University Medical Center (NUMC) is responsible for providing medical, mental, health and dental care to the inmate population." (*Id.* at 4.) Immediately following the section on NUMC is a section entitled "Grievance Procedure." (*Id.*) The section explains that a grievance is a "written inmate complaint concerning either . . . policies, procedures, rules . . . or the action or inaction of any person within the facility." (*Id.*) Grievances must be filed within five days of the act or occurrence leading to the grievance. (*Id.* at 5.) Plaintiff confirmed at his deposition that he received this booklet and learned about the process for filing grievances when he entered NCCC. (Pl.'s Dep. at 71.)

Plaintiff did not submit a grievance concerning his mental health care. Plaintiff argues that "there is no-grievance procedure for NUMC at Nassau County Jail the grievance must go-out side to hospital in order to be answer by them . . . so the (Rules) for grievance procedure for the (jail) is incorrect documents." (Pl.'s Opp. at 18.[8]) Defendants counter that plaintiff stated at his deposition that he knew how to file a grievance from his prior incarcerations at NCCC. (Pl.'s Dep. at 71.) Defendants assert that plaintiff was familiar with the grievance procedure at NCCC because he had previously filed at least two grievances relating to his medical care. (*Id.* at 74-75.) For example, plaintiff stated at his deposition, "I grieved a doctor for giving me the wrong medication." (*Id.* at 74; Grievance Form dated Nov. 18, 2009, Def.'s Mot. for Summary Judgment, Ex. K.)[9] Plaintiff also filed a grievance for "[i]nterfering with medical," alleging that corrections officers had improperly stayed in the room during one of plaintiff's medical consultations. (Pl.'s Dep. at 72.) Additionally, plaintiff stated at his deposition that he was aware

---

exceptions to the exhaustion requirement set forth in *Hemphill* and discussed, *supra*, because, as discussed in detail *infra*, plaintiff clearly has not satisfied the standard under *Hemphill*.

[7] As discussed *infra*, there are no factual disputes on the exhaustion issue in this case. Plaintiff has not offered any evidence to contradict defendants' evidentiary submission on the exhaustion issue, and acknowledges he did not exhaust.

[8] Because plaintiff has not numbered the pages in his filings, all page numbers refer to the page number assigned by the ECF docketing system.

[9] Plaintiff also submitted a grievance after no one responded to multiple "sick call slips" that he had submitted. (*Id.* at 75-76.) The record does not reflect whether he submitted this grievance before or after December 23, 2009.

7

that he could have "grieve[d]" Farhangian after the December 23rd meeting. (*Id.* at 70.)[10]

The Court concludes that plaintiff did not file a grievance in proper compliance with NCCC policy. Although plaintiff contends that "there is no-grievance procedure for NUMC at Nassau County Jail" (Pl.'s Opp. at 18.), his argument is undermined by the fact that he previously filed at least two grievances relating to his medical care. (Pl.'s Dep. at 72-75.) Moreover, the handbook states that the grievance procedure applies to "any person within the facility." (Ex. J at 4.) The policy sets forth "Non-Grievable Matters," such as grievances "regarding depositions, surcharges, and sanctions resulting from disciplinary hearings" or "administrative segregations decisions," and medical care is not among those items. (*Id.*) Thus, plaintiff's argument that there is no grievance procedure for NUMC fails.

The analysis, however, does not end there. The Second Circuit has formulated a three part test in examining failure to exhaust under the PLRA:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact available to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

*Macias v. Zenk*, 495 F.3d 37, 41 (2d Cir. 2007) (quoting *Hemphill*, 380 F.3d at 686 (internal quotation marks and citations omitted)).

As to the first exception to the exhaustion requirement, defendants have not forfeited the affirmative defense of non-exhaustion. Defendants raised the defense of non-exhaustion in their Answer and in their Motion for Summary Judgment. As to the second exception, there is no evidence that defendants have acted to inhibit plaintiff's exhaustion of remedies so as to estop defendants from raising failure to exhaust as a defense. The issue, however, is whether plaintiff has shown the existence of special circumstances that would justify his failure to comply with the administrative requirements.

Any argument that plaintiff was unable to file a grievance because he was incapacitated by the suicide attempt fails.[11]

---

[10] Specifically, the exchange went as follows: "Q: Did you suggest to Joe [Farhangian] that you wanted to speak to his bosses? A: No. You could grieve. I didn't ask him, no." (Pl.'s Dep. at 70.)

[11] The plaintiff has not actually made the argument that he was unable to file a grievance because he was incapacitated following the suicide attempt in any of his filings with the

8

Plaintiff's allegations against David concern his failure to proscribe him certain medications following plaintiff's June 15, 2009 interview. Nothing prevented plaintiff from filing a grievance within five days of June 15, 2009, yet plaintiff chose not to do so. To the extent that plaintiff alleges that the effects of David's decision not to prescribe the medication did not manifest themselves until plaintiff attempted suicide six months later – and, accordingly, plaintiff could not have filed a grievance until after the suicide attempt – plaintiff's argument also fails. Plaintiff attempted suicide on December 23, 2009, was hospitalized briefly, and returned to "regular housing on 2nd level" on December 25, 2009. ("Social Work Note," Defs.' Mot. for Summary Judgment, Ex. I.) Plaintiff has offered no evidence that he was prevented from, or was unable to file a grievance upon his return two days after the suicide attempt. Indeed, the social worker who evaluated him on December 25, 2009 noted that plaintiff was "well groomed," made "good eye contact," and was "calm" and "cooperative." (*Id.*) The same analysis applies with respect to plaintiff's failure to file a grievance against Farhangian, who saw plaintiff on the afternoon of December 23, 2009. Specifically, plaintiff could have filed a grievance against Farhangian upon his return to NCCC on December 25, 2009 and in the two days thereafter. *See, e.g.*, *Davitt v. Centric*, 3:06-cv-00502-HDM(RAM), 2010 U.S. Dist. LEXIS 73430, at *7-9 (D. Nev. May 25, 2010) (plaintiff failed to exhaust administrative remedies when he failed to file a grievance within five days of his release from the mental health unit following a suicide attempt), *adopted by* 2010 U.S. Dist. LEXIS 73372 (D. Nev. July 19, 2010).

---

Court. In an abundance of caution, however, the Court addresses this argument.

Accordingly, the Court finds that plaintiff failed to exhaust his administrative remedies and has not plausibly alleged any special circumstances (or conduct falling within any other exception to the exhaustion requirement) that would justify his failure to exhaust.

B. Deliberate Indifference to Serious Medical Need

In any event, the Court also grants summary judgment to defendants on the merits of plaintiff's Section 1983 claim for deliberate indifference to serious medical need.

To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants showed deliberate indifference to the plaintiff's serious medical need when David denied the plaintiff medication and Farhangian failed to provide plaintiff with adequate treatment for "anxiety and sleeping disorder" and plaintiff subsequently suffered a "massive anxiety attack" that triggered a suicide attempt. Defendants argue that neither defendant's actions rise to the level of deliberate indifference. As set forth below, the Court

agrees. Even accepting plaintiff's evidence as true and drawing all reasonable inferences in his favor, a rational jury could not conclude that defendants were deliberately indifferent to a serious medical need.

1. Legal Standard

"Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). The Court analyzes plaintiff's deliberate indifference claim under Eighth Amendment jurisprudence.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (quotation marks and citation omitted). As the Second Circuit has explained,

> [t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. Cnty. of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007). Thus, according to the Second Circuit,

> [d]efendants may be held liable under § 1983 if they . . . exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety . . . . Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord*, 276 F. App'x 97, 98 (2d Cir. 2008) (citations and quotation marks omitted); *see also Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)); *Curry v. Kerik*, 163 F. Supp. 2d 232, 237 (S.D.N.Y. 2001) ("'[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health

or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks omitted))).

In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

> The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*Hayes*, 84 F.3d at 620 (internal citation omitted); *see also Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord*, the Second Circuit elaborated on this two-part test, explaining that that the first part is objective and the second part is subjective. 467 F.3d 263 (2d Cir. 2006). In particular, with respect to the first, objective element, the Second Circuit explained:

> The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

> Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the

medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also Jones v. Westchester Cnty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 413-14 (S.D.N.Y. 2008).

With respect to the second, subjective component, the Second Circuit further explained:

> The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin*, 467 F.3d at 280 (citations and question marks omitted); *see also Jones*, 557 F. Supp. 2d at 414.

   2.   David and Farhangian

Plaintiff alleges that David was deliberately indifferent to plaintiff's serious medical need when he denied plaintiff medication for "anxiety and sleeping disorder" and plaintiff subsequently attempted suicide by jumping from the second floor tier in his dorm, injuring his right leg and lower back. Although plaintiff's complaint lacks any specific allegations about Farhangian, the Court construes plaintiff's complaint as alleging that Farhangian's treatment was inadequate because it did not prevent plaintiff's suicide attempt.

      a.   Objective Element

As noted above, to determine whether a deprivation of medical care meets the objective prong of the test and is "sufficiently serious," the "first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is

only to provide reasonable care." *Salahuddin*, 467 F.3d at 279. "An inmate is not entitled to treatment by every available medical alternative as long as his treatment is reasonable." *Castro-Sanchez v. New York State Dep't of Corr. Servs.*, 10 Civ. 8314 (DLC), 2011 U.S. Dist. LEXIS 140003, at *29 (S.D.N.Y. Dec. 6, 2011) (citing *Estelle*, 429 U.S. at 107).

A court must also inquire as to how the offending conduct is inadequate. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. In this case, however, plaintiff does not allege that defendants provided no treatment; he merely alleges that they provided inadequate treatment. Accordingly, "the seriousness inquiry is narrower." *Id.*

As an initial matter, courts in the Second Circuit are not consistent in how they evaluate suicidal tendencies under the objective prong of the test for deprivation of medical care. Some courts hold that suicidal tendencies present an objectively serious medical condition, without explicitly following the "reasonable care" test set forth in *Salahuddin*. For example, in *Sims v. Gorman*, No. 09-CV-6643 (MAT), 2012 U.S. Dist. LEXIS 21614, at *13 (W.D.N.Y. Feb. 21, 2012), the court stated simply that "[plaintiff's] diagnosed mental illnesses (bipolar and antisocial personality disorders), and concomitant suicidal ideation and actual suicide attempts, constituted a serious medical need" before turning to the subjective element of the test. In *Zimmerman v. Burge*, 9:06-CV-0176 (GLS/GHL), 2009 U.S. Dist. LEXIS 88344, at *34-35 (N.D.N.Y Apr. 20, 2009), *adopted by* 2009 U.S. Dist. LEXIS 88343 (N.D.N.Y. Sept. 24, 2009), the court "assume[d] that plaintiff suffered from a sufficiently serious medical need" where plaintiff "suffered from major depression with suicidal ideation," then addressed the subjective element.

Other courts have applied the "reasonable care" test set forth in *Salahuddin*. For example, in *Mercado v. City of New York*, 08 Civ. 2855 (BSJ)(HP), 2011 U.S. Dist. LEXIS 140430 (S.D.N.Y. Dec. 5, 2011), the court addressed whether defendants showed deliberate indifference in treating a plaintiff who ultimately committed suicide. In analyzing the objective element of the Eighth Amendment test, the court determined that plaintiffs failed to demonstrate "a constitutionally cognizable deprivation of medical care." The court explained that the medical professionals' determinations that plaintiff was not suicidal prior to committing suicide were not objectively "unreasonable." *Id.* at *16. In so doing, the court noted that the "parties debate whether [plaintiff] had a 'serious medical condition,' i.e. suicidality. Regardless of whether he was suicidal, that condition is not dispositive of the seriousness inquiry . . . ." *Id.* at *17 n.6. *See also Price v. Reilly*, 697 F. Supp. 2d 344, 359 (E.D.N.Y. 2010) (citing *Smith v. Carpenter*, 316 F.3d 178, 186-87 (2d Cir. 2003) ("As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk.")

This Court concludes that the "reasonable care" component of the objective prong needs to be considered in each case, including cases involving suicidality. Thus, applying the objective prong of the *Salahuddin* test, even construing the evidence in the light most favorable to plaintiff, this Court finds that no reasonable finder of fact could conclude that

David deprived the plaintiff of adequate medical care. The following facts are uncontroverted. David saw plaintiff once, on June 15, 2009, as part of plaintiff's mental health evaluation. In performing this assessment, David contacted Angela Rainey, plaintiff's counselor at EDNY. Rainey advised David that the plaintiff was receiving Seroquel at bedtime, and Celexa for anxiety. As noted *supra*, in his affidavit, David states that Rainey reported that plaintiff was "extremely manipulative."[12] (David Aff.; Pl's. 56.1 ¶ 7). David also reviewed intake notes from Felice Barasch, a psychiatric social worker with mental health who had interviewed the plaintiff on June 13, 2009. According to Barasch's notes, plaintiff reported his treatment at EDNY for anxiety and sleep problems, and related that in the past he had had thoughts of suicide and had made suicidal gestures. Plaintiff also confirmed a history of substance of abuse. During the interview with David, plaintiff again related that he had a serious history of drug abuse, including cannabis and crack cocaine. Plaintiff reported no history of psychiatric hospitalization. Plaintiff does not claim, nor is there any evidence, that plaintiff told David he was suicidal. David determined that plaintiff was neither depressed nor suicidal, and concluded that he was not in need of medication. Instead, David offered the plaintiff mental health services and counseling to help with his coping skills. David had no further interactions with plaintiff. Plaintiff's mental health chart reveals that plaintiff was subsequently seen for regularly scheduled counseling visits through September 2009, and thereafter on request.

---

[12] Although plaintiff disputes that Rainey said this (Pl's. 56.1 ¶ 7), he does not claim to have been present for the conversation, nor does he cite any evidence to contradict it.

Given these uncontroverted facts, no reasonable factfinder could conclude that David did not offer the plaintiff reasonable care in response to plaintiff's medical condition. Although David chose not to prescribe anti-anxiety medication to the plaintiff, he offered further counseling, which plaintiff availed himself of. Accordingly, plaintiff has failed to put forth any evidence from which a jury could reasonably conclude that David deprived him of adequate medical care in a "sufficiently serious" manner.

Similarly, plaintiff also fails to submit evidence that creates a genuine issue of fact on the issue of whether defendant Farhangian deprived plaintiff of reasonable medical care in response to the plaintiff's medical condition. As a threshold matter, although plaintiff named social worker Farhangian as a defendant, plaintiff failed to allege any facts against him in the complaint. Moreover, to the extent plaintiff is claiming that Farhangian should have prescribed medication for him, it is uncontroverted that Farhangian is a social worker, and is not licensed to prescribe medication. In any event, even if plaintiff is claiming Farhangian should have provided some other care, the uncontroverted evidence described below demonstrates that Farhangian did meet with plaintiff on several occasions, made an assessment, offered plaintiff certain options, and conveyed information to Corrections. In particular, Farhangian interviewed plaintiff on December 3, 2009 because Corrections informed Farhangian that plaintiff had threatened to kill himself. The plaintiff denied making this statement, however, advising Farhangian that he just wanted to speak to someone. Farhangian assessed the plaintiff and scheduled him for further counseling the next day. Farhangian saw plaintiff again on December 18, 2009, and found him to be "calm, cooperative and

future oriented." (Affidavit of Joseph Farhangian, Defs.' Mot. for Summary Judgment, Ex. F ("Farhangian Aff.") ¶ 5.) Plaintiff returned on December 23, 2009, stating that he was "going to kill himself." In Farhangian's judgment, plaintiff "did not appear depressed, and did not have a plan." (*Id.* ¶ 6.) Farhangian believed that plaintiff "had a history of making threats in the past in an attempt to get what he wanted with no actual suicide attempts or gestures." (*Id.*) Farhangian "did not think that [plaintiff] was suicidal, but rather was concerned with his housing situation," and reported plaintiff's housing concerns to Corrections. (Pl.'s Dep. at 69-70; Farhangian Aff. ¶ 6, Defs.' 56.1 ¶ 12.) Four hours later, the plaintiff made the suicidal gesture. Even viewing the facts in the light most favorable to plaintiff, no reasonable factfinder could conclude that Farhangian acted unreasonably in failing to take further actions in response to plaintiff's threat to harm himself. In Farhangian's judgment, plaintiff was not suicidal. Farhangian offered to place plaintiff in protective custody, and reported plaintiff's housing issues to Corrections. Accordingly, plaintiff has failed to provide evidence to contradict Farhangian's position and to create a genuine issue of fact as to whether Farhangian deprived him of adequate medical care in a "sufficiently serious" manner.[13]

b.  Subjective Element

As discussed above, the second requirement for an Eighth Amendment violation is subjective: whether the prison official acted with a "sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280 (citation omitted). "Deliberate indifference . . . requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* Even accepting plaintiff's version of events as true and drawing all reasonable inferences in his favor, no rational jury could conclude that either David or Farhangian acted with deliberate indifference to plaintiff.

As noted *supra*, David interviewed plaintiff as part of plaintiff's mental health evaluation. In performing his assessment, David contacted Angela Rainey, plaintiff's counselor at EDNY, and reviewed Barasch's intake notes. Rainey advised David that the plaintiff was receiving Seroquel at bedtime, and Celexa for anxiety. During the interview, plaintiff related a serious history of drug abuse. Plaintiff reported no history of psychiatric hospitalization. Following the interview, David found that plaintiff was neither depressed nor suicidal, and concluded that he was not in need of medication. David offered plaintiff mental health services and counseling, which plaintiff availed himself of, attending regularly scheduled counseling visits through September 2009, and thereafter on request. David's actions under these circumstances, which are uncontroverted, do not rise to the level of deliberate medical indifference as a matter of law. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Risch v. Hulihan*, 9:09-CV-330, 2010 U.S. Dist. LEXIS 137094, at *21 (N.D.N.Y Dec. 29, 2010) ("After plaintiff was taken off [antipsychotic and

---

[13] Even assuming, *arguendo*, that plaintiff demonstrated that defendants failed to provide reasonable care in response to a serious medical condition, the Court would still grant defendants' motion for summary judgment on the grounds that defendants did not act with deliberate indifference to the plaintiff's health.

15

antidepressant] medications, defendants continued to monitor his status, provided monthly therapy, consulted with a treatment team, and advised him to contact defendant [therapist] any time he felt additional counseling was needed. Accordingly, there is insufficient evidence to establish that defendants acted with a culpable state of mind to satisfy the subjective element of the deliberate indifference claim."); *Zimmerman*, 2009 U.S. Dist. LEXIS 88344, at *35-36 (granting summary judgment to prison officials who did not permit plaintiff to participate in one particular mental health program, but who provided him with counseling and with an anti-depressant, noting that plaintiff "was not constitutionally entitled to his preferred care").

Similarly, Farhangian, a licensed clinical social worker, cannot even prescribe medication. Thus, to the extent that plaintiff's claim is based on Farhangian's failure to prescribe him certain medications, plaintiff's claim fails. Assuming, however, that plaintiff is attempting to allege that Farhangian failed to provide him with care for anxiety so as to prevent his suicide attempt, plaintiff has failed to present evidence to create a genuine disputed issue of material fact as to whether Farhangian acted with deliberate indifference. Farhangian interviewed plaintiff on December 3, 2009 because Corrections informed Farhangian that plaintiff had threatened to kill himself. The plaintiff denied making this statement, however, advising Farhangian that he just wanted to speak to someone. Farhangian assessed the plaintiff and scheduled him for further counseling the next day. Farhangian saw plaintiff again on December 18, 2009 and found him to be cooperative and future oriented. Plaintiff returned on December 23, 2009, stating that he was "going to kill himself." During the interview with Farhangian, plaintiff described his anxiety problems and said he didn't "feel strong enough to make it in the dorm" and needed to be "isolated" so that he didn't harm anyone. (Pl.'s Dep. at 68.) Plaintiff told Farhangian that he was "harmful to myself and others." (*Id.* at 69.) Farhangian offered to put plaintiff in protective custody, but said that he could not change plaintiff's housing. In Farhangian's judgment, plaintiff "did not appear depressed, and did not have a plan. (Farhangian Aff. ¶ 6.) Farhangian believed that plaintiff "had a history of making threats in the past in an attempt to get what he wanted with no actual suicide attempts or gestures." (*Id.*) Farhangian "did not think that [plaintiff] was suicidal, but rather was concerned with his housing situation," and reported plaintiff's housing concerns to Corrections. (Pl.'s Dep. at 69-70; Farhangian Aff. ¶ 6, Defs.' 56.1 ¶ 12.) Four hours later, the plaintiff made the suicidal gesture.

Deliberate indifference requires that "the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin*, 467 F.3d at 280. In Farhangian's judgment, there was no "substantial risk" that plaintiff would harm himself. Even viewing the facts in the light most favorable to plaintiff, a rational jury could only conclude, at worst, that Farhangian misjudged the seriousness of the situation. Such conduct does not rise to the level of deliberate indifference. *See Estelle*, 429 U.S. at 105-06 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical

16

malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Sims*, 2012 U.S. Dist. LEXIS 21614, at *13 (granting summary judgment on Eighth Amendment claim to medical professionals who disagreed about whether plaintiff, who was "voicing suicidal threats," should be returned to the Special Housing Unit ("SHU"), when, upon return to the SHU, plaintiff attempted suicide); *Mercado*, 2011 U.S. Dist. LEXIS 140430, at *19 (mental health clinician was not deliberately indifferent when he "concluded, in his professional opinion, that [plaintiff] was not suicidal," even though plaintiff subsequently committed suicide); *Hanrahan v. Menon*, 9:07-CV-610, 2010 U.S. Dist. LEXIS 142452, at *30 (N.D.N.Y Dec. 15, 2010) ("The conclusion of the mental health staff . . . that plaintiff's primary health issue was substance abuse, and that he was not suffering from a major mental illness that required medication, clearly did not reflect deliberate indifference to a serious medical need."), *adopted by* 2011 U.S. Dist. LEXIS 35337 (N.D.N.Y, Mar. 31, 2011).

In sum, given the uncontroverted evidence in the record, the Court concludes that no rational jury could conclude that either David or Farhangian acted with deliberate indifference to plaintiff's medical needs. Accordingly, even if plaintiff could overcome the exhaustion requirement, the Court concludes that summary judgment is warranted on the merits in favor of David and Farhangian on plaintiff's Section 1983 claims.

3. Municipal Liability against NHCC

Plaintiff alleges that NHCC is liable under Section 1983 pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-91 (1978). As set forth below, this claim cannot survive summary judgment.

Under *Monell*, a municipal entity may be held liable under Section 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." 436 U.S. at 694; *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). A policy, custom, or practice of the municipal entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson*, 375 F.3d at 226 (quoting *Kern*, 93 F.3d at 44).

However, a municipal entity may only be held liable where the entity itself commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *see also Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."); *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) ("A municipality may not be held liable in an action under 42 U.S.C. § 1983 for actions alleged to be unconstitutional by its employees below the policymaking level solely on the basis of *respondeat superior*."); *Vippolis v. Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("A plaintiff who seeks to hold a municipality liable in

damages under section 1983 must prove that the municipality was, in the language of the statute, the 'person who . . . subjected, or cause[d] [him] to be subjected,' to the deprivation of his constitutional rights." (quoting 42 U.S.C. § 1983)).

Because plaintiff has failed to demonstrate any Eighth Amendment violations as to the individual defendants (for the reasons discussed *infra*), he cannot demonstrate that constitutional violations occurred pursuant to a custom or policy at NHCC. *See Mercado*, 2011 U.S. Dist. LEXIS 140430, at *26 (because there was "no independent, underlying" Eighth Amendment violation, there was "no basis for municipal or supervisory liability"). Furthermore, plaintiff has not provided any evidence of an alleged policy, practice or custom at NHCC that deprived plaintiff of his constitutional rights.[14] Accordingly, the Court grants summary judgment to NHCC on this claim.

## C. Supplemental Jurisdiction

Having granted summary judgment to defendants on plaintiff's federal claim under § 1983, the only remaining claims are plaintiff's state law claims. In plaintiff's "Motion to Amend the Pleading," plaintiff alleges "negligence, and greater negligence. Pain and suffering, emotional stress, destress [sic], and physical lower back pain." Oct. 13, 2010, ECF No. 19. However, having determined that plaintiff's federal claims against the defendants do not survive the defendants' motion for judgment on the pleadings, the Court concludes that retaining jurisdiction over any state law claim is unwarranted. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)). Therefore, in the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiff's state law claim because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); s*ee also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99 Civ. 3608 (WK), 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court."). Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over plaintiff's remaining state law claims given the absence of any federal

---

[14] Although plaintiff attaches a newspaper article and other materials on this issue, he has offered no admissible evidence on the *Monell* claim that would allow this claim to survive summary judgment.

claim that survives the motion to dismiss and dismisses any such claims without prejudice.

### III. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment on the federal claims, and the federal claims are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over the state law claims and, thus, those claims are dismissed without prejudice to plaintiff attempting to assert them in state court. The Clerk of the Court shall enter judgment accordingly and close the case. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 23, 2012
      Central Islip, NY

\* \* \*

Plaintiff is proceeding *pro se*, Southport Correctional Facility, P.O. Box 2000, Pine City, NY 14871-2000. The attorneys for the defendants are Edward J. Troy and Alexander V. Sansone, Law Office of Edward J. Troy, 44 Broadway, Greenlawn, NY 11740.